UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO: 4:13-MJ-1027 |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | Houston, Texas |
| | ) | |
| TROY RAY TRAWEEK, | ) | Wednesday, October 23, 2013 |
| | ) | (10:09 a.m. to 10:11 a.m.) |
| Defendant. | ) | (10:23 a.m. to 11:25 a.m.) |


PRELIMINARY EXAMINATION AND DETENTION HEARING

BEFORE THE HONORABLE FRANCES H. STACY,
UNITED STATES MAGISTRATE JUDGE


Appearances:            See Next Page

Court Recorder:         Ketta Lindsay

Clerk:                  Beverly White

Transcriber:            Exceptional Reporting Services, Inc.
                        P.O. Box 18668
                        Corpus Christi, TX 78480-8668
                        361 949-2988

THIS TRANSCRIPT HAS BEEN FURNISHED AT PUBLIC
EXPENSE UNDER THE CRIMINAL JUSTICE ACT AND MAY
BE USED ONLY AS AUTHORIZED BY COURT ORDER.
UNAUTHORIZED REPRODUCTION WILL RESULT IN AN
ASSESSMENT AGAINST COUNSEL FOR THE COST OF AN
ORIGINAL AND ONE COPY AT THE OFFICIAL RATE.
General Order 94-15, United States District Court,
Southern District of Texas.

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

**APPEARANCES FOR:**


Plaintiff:                    SHERRI LYNN ZACK, ESQ.
                              JENNIE BASILE, ESQ.
                              Office of the United States Attorney
                              1000 Louisiana
                              Suite 2300
                              Houston, Texas 77002

Defendant:                    NATALIA MARISSA CORNELIO, ESQ.
                              Assistant Federal Public Defender
                              440 Louisiana
                              Suite 1350
                              Houston, Texas 77002

INDEX

| GOVERNMENT'S WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| JEFFREY CHAPPELL | 6 | 24 | 32 | 34 |

| GOVERNMENT'S EXHIBITS | MARKED FOR IDENTIFICATION |
|---|---|
| 1, 1A, 2, 2A | 42 |

1    **Houston, Texas; Wednesday, October 23, 2013; 10:09 a.m.**

2                    **(Call to Order)**

3          **THE COURT:**  The next case is 2013-1027, *U.S. versus*

4    *Troy Ray Traweek*, T-R-A-W-E-E-K.

5          **MS. ZACK:**  Good morning, your Honor.  Sherri Zack on

6    behalf of the United States.

7          **THE COURT:**  2013-1027M.  Hi, Mr. Traweek.  I --

8          **MS. CORNELIO:**  Good morning, your Honor.

9          **THE COURT:**  Are you his lawyer?

10         **MS. CORNELIO:**  Yes, your Honor.  Natalia Cornelio for

11   Mr. Traweek.

12         **THE COURT:**  Okay.  We're set for preliminary and

13   detention hearing?

14         **MS. CORNELIO:**  Yes, your Honor.

15         **THE COURT:**  Are we ready to proceed?

16         **MS. CORNELIO:**  Yes, your Honor.

17         **THE COURT:**  All right.  You may have a seat at the

18   counsel table next to your lawyer.

19         **MS. CORNELIO:**  May I approach briefly, your Honor?

20         **THE COURT:**  Yes.

21      **(Begin bench conference at 10:10 a.m.)**

22         **THE COURT:**  Okay.  Stand up here and talk into the

23   microphone.  It won't be broadcast into courtroom.

24         **MS. CORNELIO:**  Thank you, Judge.

25         **THE COURT:**  Yeah.

1          **MS. CORNELIO:**  We're just requesting if it's possible

2    to ask the other inmate to leave?

3          **THE COURT:**  What?

4          **MS. CORNELIO:**  To ask the other inmate to leave the

5    -- to have the Marshals escort the other inmate out of the

6    courtroom for my client's safety during the proceeding.

7          **THE COURT:**  What do you think?

8          **MS. ZACK:**  It's -- I mean, that's fine with me.

9          **THE COURT:**  It's up to the lawyer.  I'm fine.

10   Whatever.  We'll take a recess.  We're going to have to take

11   everybody upstairs.

12         **MS. CORNELIO:**  Yes, and I don't know how that works.

13         **THE COURT:**  It's just -- we're going to this person

14   back.  That's fine with me.

15         **MS. CORNELIO:**  Thank you, Judge.

16         **THE COURT:**  All right.  Just tell Beverly, please.

17      **(End bench conference at 10:10 a.m.)**

18      **(Pause)**

19         **THE COURT:**  We'll just take a recess, and you can do

20   it the way you want to do it and we'll resume Court when you're

21   ready.  No rush.

22      **(The Court confers with the Marshal)**

23         **THE COURT:**  Okay.  We're going to -- we're taking a

24   brief recess and then we'll resume with this hearing in about

25   15 minutes, or 20 minutes or so whenever -- five minutes.

1          All right.  Don't go too far.  We'll be back in five

2    minutes.

3          **MS. CORNELIO:**  Thank you, your Honor.

4          **THE MARSHAL:**  All rise.

5      **(A recess was taken from 10:11 to 10:23 a.m.)**

6          **THE COURT:**  Please be seated.  All right.  Please be

7    seated.  Let's resume with our probable cause and bail hearing

8    in Number 2013-1027.

9          Who is the Government's first witness?

10         **MS. ZACK:**  Your Honor, at this time the United States

11   would call Jeff Chappell.

12         **THE COURT:**  Mr. Chappell, come forward please and be

13   sworn.

14         **JEFFREY CHAPPELL, GOVERNMENT'S WITNESS, SWORN**

15         **THE COURT:**  All right.  You may proceed.

16         **MS. ZACK:**  Thank you, your Honor.

17                       **DIRECT EXAMINATION**

18   **BY MS. ZACK:**

19   Q    Can you please state your name and spell your last name

20   for the record?

21   A    Jeffrey Chappell.  Last name is C-H-A-P-P-E-L-L.

22   Q    And how are you employed?

23   A    I'm employed as a special agent with Homeland Security

24   Investigations.

25   Q    And how long have you been a special agent with Homeland

Chappell - Direct / By Ms. Zack                7

1    Security Investigations?

2    A    Almost 10 years.

3    Q    And are you assigned to any particular group or unit

4    within Homeland Security Investigations?

5    A    Yes, ma'am.  I'm assigned to the cyber investigations

6    group specifically dealing with computer forensics and child

7    exploitation.

8    Q    And how long have you been doing that?

9    A    Almost 10 years.

10   Q    And in order to do that, did you received specialized

11   training?

12   A    Yes, ma'am.

13   Q    And is that training ongoing?

14   A    Yes, ma'am.

15   Q    And would you say it's a fair characterization that you

16   have investigated both forensically as well as in general

17   hundreds of child exploitation cases in that 10 years?

18   A    Yes, ma'am.

19   Q    If not more?

20   A    Yes, ma'am.

21   Q    Okay.  I would like to direct your attention to an

22   individual by the name of Troy Traweek.  Do you see that

23   individual in Court here today?

24   A    Yes, ma'am.

25   Q    And can you identify him by an article of clothing that

1    distinguishes him from anyone else in the courtroom?

2    A    Yes, ma'am.  The gentleman sitting directly in front me in

3    the green jumpsuit with the light bandages.

4    Q    Okay.

5         **MS. ZACK:**  Your Honor, may the record reflect an

6    in-court identification of the Defendant?

7             **THE COURT:**  The record will so reflect.

8         **MS. ZACK:**  Thank you.

9    **BY MS. ZACK:**

10   Q    How is it, Special Agent Chappell, that the Defendant came

11   to the attention of HSI?

12   A    Back on or about October 11th, we received information, an

13   investigative lead, from our cyber crime center out of

14   Virginia.  They in turn had received information from the

15   Australian law enforcement authorities regarding an individual

16   subsequently identified as Mr. Traweek, where this individual

17   had been -- contacted an undercover agent in Australia

18   regarding child pornography and the exploitation of children.

19   Q    Okay.  And in what forum was that contact?  How was that

20   accomplished?

21   A    Initially through an image hosting website and then

22   subsequently by email.

23   Q    Okay.  And can you explain to us what an image hosting

24   website is?

25   A    Basically, it's a website where a user goes on and creates

1   a profile.  It means granted access to the website, and through

2   that access they're allowed to upload and download different

3   files; and in this particular case, those files would be

4   graphic files and videos.

5   Q    Okay.  So let's talk about this.  So there was

6   communication between the Defendant and an undercover on this

7   image hosting website; is that correct?

8   A    Yes, ma'am.

9   Q    And is this something where besides trading images there

10  can be chatting as well?

11  A    Yes, ma'am.  It is possible.

12  Q    Okay.  And you said that there's a profile?

13  A    Yes, ma'am.

14  Q    Did the Defendant have a profile?

15  A    Yes, ma'am.

16  Q    And can you tell us about that profile?

17  A    The information received was the profile was with the user

18  name -- I want to make sure I get it correctly here;

19  Explicitcure2008 was the user name.

20  Q    Okay.  And for the court reporter, can you spell that,

21  please?

22  A    Yes, ma'am.  That would be E-X-P-L-I-C-I-T-C-U-R-E-2-0-0-

23  8.

24  Q    And that was the user name?

25  A    Correct.

Chappell - Direct / By Ms. Zack                        10

1   Q    And when we say "profile," are we talking like a Facebook

2   profile?  Like is there a picture and then some, like, some

3   information and maybe other, like, photo albums, or likes or

4   things like that?

5   A    Yes, ma'am.

6   Q    Okay.  Was there a profile picture?

7   A    Yes, ma'am.

8   Q    And can you describe that profile picture for the Court?

9   A    The profile picture was of a prepubescent child, nude,

10  approximately 7 to 8 years old with exposed breasts and vaginal

11  area.

12  Q    And that was the profile picture.  Were there photo albums

13  available?

14  A    Yes, ma'am.

15  Q    And how many?

16  A    Three.

17  Q    And can you tell me the -- were these photo albums named?

18  A    Yes, ma'am.

19  Q    Do you know what the names of the photo albums were?

20  A    I don't have them with me.  I can tell you that one of the

21  albums was -- referenced children, and was a preview.  The

22  second one referenced the same children and was locked.  And

23  then the third one was called X in the shower.

24  Q    Okay.  And when you say "locked," what does that mean?

25  A    It's password protected and can only be accessed by the

EXCEPTIONAL REPORTING SERVICES, INC

Chappell - Direct / By Ms. Zack                                    11

1    user or whoever the user provides the password too.

2    Q    Okay.  Now, you said there was communication between the

3    undercover -- oh, were there any email addresses associated

4    with this profile?

5    A    Yes, ma'am; two.

6    Q    And what were they?

7    A    Explicitcure2008@yahoo.com and then

8    besttrader69@gmail.com.

9    Q    Okay.  Now, you indicated that there were some chats

10   between the undercover and the Defendant.

11   A    Yes, ma'am.

12   Q    How do we know it was the Defendant?  What was the names

13   of the people chatting?

14   A    The -- it was through an email chat or email

15   correspondence, and the gentleman or this individual contact in

16   the UC identified himself as Troy Traweek in the chats.

17   Q    Okay.  So when we visually look at the chat, it'll have

18   the name Troy Traweek when he's saying stuff, and then whatever

19   the name undercover is using, because I'm guessing they don't

20   put undercover.

21   A    That is correct.

22   Q    Okay.  And what was the chat about?

23   A    The chat was specifically regarding trading images of boys

24   and girls, and also the Defendant who identified himself as

25   Troy Traweek talked about wanting to sexually exploit children

1    and his daughter, and wanted advice or information on how he

2    could go about doing that.

3    Q    Okay.  Were there -- the images were discussed; were

4    images exchanged?

5    A    Yes.

6    Q    And can you describe the images that came from the Troy

7    Traweek user?

8    A    Yes, ma'am.  The images that were sent to the undercover,

9    the individual identified himself as Troy Traweek had talked

10   about that they were taken with a hidden camera, and they

11   depicted a prepubescent child approximately 6 to 7 years old,

12   and another one 7 to 8 years old, nude, exposed breasts and

13   vaginal area.  One inside of a bedroom and the other inside of

14   a bathroom.

15   Q    Okay.  And so all of this information was provided to HSI,

16   correct?

17   A    Yes, ma'am.

18   Q    And that went to Task Force Officer Fody (phonetic); is

19   that correct?

20   A    That is correct.

21   Q    And based on all of that information, and the email

22   addresses, and IP addresses, was Task Force Officer Fody able

23   to come up with subscriber information?

24   A    Yes, ma'am.

25   Q    And the subscriber ended up being who?

1  A    Terry Traweek.

2  Q    Okay.  And did Task Force Officer Fody then obtain a state

3  search warrant for the residence of Terry Traweek?

4  A    That is correct.

5  Q    And was that warrant executed on October 16th?

6  A    Yes, ma'am.

7  Q    And were you present when that warrant was executed?

8  A    Yes, ma'am.

9  Q    When the warrant was executed, who was present at the

10  residence?

11  A    As far as who lived in the residence?

12  Q    Yes.

13  A    Terry Traweek, the father, Troy Traweek, Mr. Traweek's

14  girlfriend, and one of her daughters.

15  Q    Okay.  And how many -- does she live there?

16  A    Yes, ma'am.

17  Q    The girlfriend?

18  A    Yes, ma'am.

19  Q    And you said one of her daughters?

20  A    Yes, ma'am.

21  Q    Does that mean there are two?

22  A    There are two daughters, correct.

23  Q    And their approximate ages?

24  A    Approximately 8 years old and I believe 6 years old.

25  Q    And their initials; are you aware of their initials?

1   A     Yes, ma'am; S.J. and B.F.

2   Q     Okay.  And were -- was there -- were there computers

3   located in the home?

4   A     Yes, ma'am.

5   Q     And where were these computers located?

6   A     Computer -- one computer was in -- every bedroom had a --

7   had some computers in them.  The one computer was in the

8   girlfriend's bedroom where she stayed with the children, and

9   then the other working computers were in the bedroom that the

10  father, Terry Traweek, slept in.

11  Q     Okay.  And where did the Defendant sleep?

12  A     There was also a third bedroom next to where the

13  girlfriend and the children were that had a bed in it, and

14  there were articles of clothing and stuff belonging to

15  Mr. Traweek in there.

16  Q     Okay.  And were -- besides computers, was there other

17  digital media in the home?

18  A     Yes, ma'am.

19  Q     What did you find?

20  A     Flash drives; thumb drives.

21  Q     Okay.  And were any cameras, camcorders, any type of

22  recording devices found?

23  A     Yes, ma'am.

24  Q     Okay.  Now when the warrant was executed, did you have the

25  images from the undercover exchange in Australia?

Chappell - Direct / By Ms. Zack                    15

1   A    Yes, ma'am.

2   Q    And did those images appear to be homemade?

3   A    Yes, ma'am.

4   Q    And what about them led you to believe they were homemade?

5   A    Investigator Fody and myself, and another agent, went

6   through the house looking at the various rooms.  We were able

7   to match one photograph taken in the bedroom with the same

8   bedroom that the girlfriend and the two children sleep in.

9   There were various articles in the picture that were still in

10  the bedroom and matched.

11          Then we also did the same thing with the main

12  bathroom in the hallway.  Visually it was the same, as well as

13  articles that were in the bathroom were also in the picture of

14  the child.

15  Q    Now were you able to determine from where the pictures in

16  the bathroom were taken?

17  A    Yes, ma'am.

18  Q    And where was that?

19  A    Behind the door, and it appears the camera was placed

20  inside of a plastic container that's normally used for a toilet

21  brush.  We believe that that's where the camera was placed.

22  Q    Okay.  And you found a camera; is that correct?

23  A    Yes, ma'am.

24  Q    Okay.  And can you tell the Court what you found on that

25  camera?

1   A    A forensic analysis of the camera revealed a video showing

2   Mr. Traweek placing that camera while it was on and on record,

3   what appeared to be in that corner behind the door of the

4   bathroom and then placing another camera next to the toilet

5   between the toilet and the vanity sink.

6   Q    And the girlfriend that was present, was she interviewed?

7   A    Yes, ma'am.

8   Q    And did she tell you how long she and her daughters had

9   been residing in the home?

10   A    I believe it was a couple of months.

11   Q    Okay.  So not very long?

12   A    Not very long; no ma'am.

13   Q    And the chat that occurred and the exchange of pictures

14   occurred, did that happen within the timeframe within which she

15   was living in the home?

16   A    Yes, ma'am.

17   Q    Now, in speaking to the girlfriend, did you discover

18   whether or not she had found anything strange on any of her

19   digital media or computers or digital devices?

20   A    Yes, ma'am.

21   Q    What did she find?

22   A    She relayed that at one point she had found a search query

23   typed out for Google or for a search engine on her phone that

24   stated how to trick a 9 year-old into giving a blow job.

25   Q    And in the chats, does the Defendant describe the

1    children in the home in such a way as that they correspond to

2    the girlfriend's daughters?

3    A    He does refer to them as his daughters.

4    Q    Okay.

5    A    The chats that I have don't indicate an age.

6    Q    Okay.  And were the images shown to the girlfriend?

7    A    Yes, ma'am.

8    Q    And was she able to identify them as her daughters?

9    A    Yes, ma'am.

10   Q    Okay.  And you believe that these images meet the federal

11   definition of child pornography?

12   A    Yes, ma'am.

13   Q    Okay.  Now, was the girlfriend asked about email addresses

14   and whether or not she was familiar with the email addresses

15   used by her boyfriend?

16   A    Yes, ma'am.

17   Q    And what did she tell you?

18   A    She stated that his email address was the

19   explicitcure2008@yahoo.com.

20   Q    Okay.  Now, let's talk about, you said there were some

21   thumb drives or flash drives found?

22   A    Yes, ma'am.

23   Q    And where would those have been found?

24   A    They were found in a pair of shorts belonging to

25   Mr. Traweek.

1    Q    Okay.  And let's talk about those.  Have you started to

2    forensically examine them?

3    A    Yes, ma'am.

4    Q    And what can you tell me about them?

5    A    The one flash drive, it's a PNY 8 gigabyte flash drive or

6    thumb drive; contains one folder named Atari.

7    Q    Okay.  Like the game?

8    A    Like the game.  Yes, ma'am.

9    Q    Okay.

10   A    Within that folder are several other folders entitled such

11   as, for example, C-P, J-B, my personal.  Within those folders

12   are encrypted RAR files --

13   Q    Okay.

14   A    -- dot R-A-R files.

15   Q    All right.  Let's slow down.

16   A    Okay.

17   Q    You said there are several folders and one of them is C-P.

18   A    Correct.

19   Q    Based on your training and experience, what does that

20   stand for?

21   A    Child pornography.

22   Q    You said the next one was J-B?

23   A    Correct.

24   Q    Does that have any significance to you?

25   A    Not at this time.  No, ma'am but --

1  Q    Is that ever used as a abbreviation for jail bait?

2  A    Yes, ma'am.

3  Q    And is "jail bait" a term associated occasionally with

4  child pornography?

5  A    Yes, ma'am.

6  Q    And you said there was also one named personal?

7  A    My personal; yes, ma'am.

8  Q    My personal.  And then you said there -- within those

9  folders, there were RAR encrypted files?

10 A    Correct.

11 Q    Okay.  Let's spell RAR.

12 A    It's referred to as dot R-A-R.

13 Q    Okay.  And what does that mean?

14 A    A RAR file is a -- basically a container.  It's a folder

15 where you can place other files and folders into it.  But a RAR

16 file has the capability of compressing those files that it

17 contains to make it smaller so you can email it and do other

18 things with it.  It also has the ability to encrypt the

19 contents or the individual files that are contained within the

20 RAR file.

21 Q    So it's like an encrypted zip file?

22 A    It's another type of zip file, yes ma'am.

23 Q    Okay.  Were you able to get into those files?

24 A    I can get in to see the individual files within that

25 container; the RAR container.

1    Q     Okay.

2    A     I cannot see the individual files themselves.

3    Q     Okay.  So you can see the titles to those files?

4    A     That is correct.

5    Q     Okay.  And within there, how does it break down?

6    A     Within the different folders -- within the C-P folder --

7    Q     Uh-huh.

8    A     -- for example, there's neighborhood tweet vids,

9    previewing USB RAR.  Under the USB RAR file, the USB.RAR --

10   Q     Uh-huh.

11   A     -- there were numerous files that had terms associated

12   with them which are consistent with child pornography, such as

13   6 Y-O comes hard.  The Y-O being years of age.

14   Q     Okay.

15   A     P-T-H-C, which stands for preteen hardcore.  There's

16   various files under -- inside of that RAR file with those

17   names.

18   Q     Okay.  Now under the "my personal," what were you able to

19   see?

20   A     There was a subfolder in there called "Brooke Savannah"

21   (phonetic).

22   Q     And do those names have any significance?

23   A     Yes, ma'am.

24   Q     And what is that?

25   A     They relate back to the victims.

Chappell - Direct / By Ms. Zack                    21

 1  Q    To the girlfriend's daughters?

 2  A    Correct.

 3  Q    That is their first names, correct?

 4  A    Correct.

 5  Q    Brooke and Savannah?

 6  A    Yes.

 7  Q    Okay.  And were there image files, video files, both?

 8  A    What appears to be both, and each of those files contain

 9  the same name such as Brooke001, 002, 003, Savannah001, 002,

10  003.

11  Q    Would you categorize this thumb drive as being incredibly

12  well organized?

13  A    Yes, ma'am.

14  Q    And would the person using this thumb drive have gone to

15  great lengths to make this unable to be viewed by anyone other

16  than someone who had the encryption key?

17  A    Correct.

18  Q    Okay.  Now, this was on a thumb drive found in the

19  Defendant's shorts?

20  A    Correct.

21  Q    And you said there was computers in the room?

22  A    Yes, ma'am.

23  Q    On that computer, were there encrypted files?

24  A    Yes, ma'am.

25  Q    And do the file names correspond similarly to child

1    pornography and to the girlfriend's daughters?

2    A    Yes, ma'am; the same type of file names that were found on

3    the thumb drive.

4    Q    Okay.  And how do we know that these aren't just family

5    fun photos and things like that?

6    A    I've also located and previewed photographs of the

7    children, the girlfriend, and the Defendant at various places,

8    family photos, out and about, beach, different places, and

9    they're titled differently.  They're also not encrypted, and

10   they're also within places that you'd normally find photos such

11   as "My Photos" part of the user account of the operating

12   system.

13   Q    And that's on the computer that was shared by he and the

14   girlfriend in that room that she and the children slept in?

15   A    That is correct.

16   Q    Okay.  And would it have been readily visible to the

17   girlfriend that there were encrypted files on there or would

18   you have to know they're there and know to look for them?

19   A    You'd have to dig to find them.  Yes, ma'am.

20   Q    Okay.  Did the girlfriend express any type of

21   sophisticated computer knowledge or any awareness of any of

22   these activities of the Defendant?

23   A    No, ma'am, she did not.

24   Q    And let's talk about the Defendant.  You've had an

25   opportunity to review his criminal history briefly?

1    A    Yes, ma'am.

2    Q    And would you agree that it demonstrates violence?

3    A    Yes, ma'am.

4    Q    Repeatedly?

5    A    Yes, ma'am.

6    Q    Okay.  And you're aware that the Defendant is currently

7    unemployed; is that correct?

8    A    I believe so, yes, ma'am.

9    Q    Okay.  And that he was living in the home owned by his

10   father, correct?

11   A    That is correct.

12   Q    Or mortgaged by his father?

13   A    That is correct.

14   Q    Okay.  The images of the -- or the file -- the titles that

15   you talked about that are consistent with child pornography,

16   like I believe you mentioned one with a 6 year-old or

17   9 year-old, whatever.  In your training and experience, are

18   those titles that are consistent with child pornography that is

19   regularly traded and maintained by persons with a sexual

20   interest in children?

21   A    Absolutely; yes, ma'am.

22   Q    And consistent with things you've seen downloaded from the

23   Internet, correct?

24   A    Yes, ma'am.

25   Q    And distributed via peer-to-peer networks by persons with

Chappell - Cross / By Ms. Cornelio                    24

1  sexual interest in children?

2  A    Yes, ma'am.

3  Q    At this point, you have not completely finished your

4  forensic examination; is that correct?

5  A    That is correct.

6  Q    So you don't have any numbers of files or videos or

7  anything like that.  You just know that both do exist, correct?

8  A    Yes, ma'am.  That is correct.

9  Q    The home, just so we cover some bases here; the home was

10 located within the Southern District of Texas; is that correct?

11 A    Yes, ma'am.

12 Q    Okay.

13        **MS. ZACK:**  I'll pass the witness at this time, your

14 Honor.

15        **THE COURT:**  All right.  You may cross-examine, and

16 please turn the microphone towards you.  All right.

17                    **CROSS EXAMINATION**

18 **BY MS. CORNELIO:**

19 Q    Good morning.

20 A    Good morning.

21 Q    I just want to clarify something.  You said that there

22 were files on a computer found that matched a flash drive that

23 you found?

24 A    Yes, ma'am.

25 Q    Where was that computer?

Chappell - Cross / By Ms. Cornelio                          25

1    A    It was in the bedroom where the girlfriend and the

2    children slept.

3    Q    And then you said that you found one flash drive in a pair

4    of shorts?

5    A    Yes, ma'am.

6    Q    How do you know whose shorts they were?

7    A    Because they were the shorts that Mr. Traweek asked us to

8    give him when he was being dressed upon his arrest.

9    Q    And then you were describing these titles that you saw.

10   You said that the titles matched titles for known child

11   pornography that's traded on the Internet as some of the files

12   found on either the computer or the flash drive, correct?

13   A    Yes, ma'am.

14   Q    Now, that would suggest then that those files were not

15   made by Mr. Traweek?

16   A    Without seeing the contents, the actual file itself, I

17   wouldn't know whether or not -- just the terms used in the file

18   name are consistent with child pornography.

19   Q    But you did just testify that they are consistent with

20   titles known for child pornography that are traded regularly on

21   the Internet?

22   A    Yes, ma'am.  That, too.  Yes, ma'am.

23   Q    Okay.  The files that you said were named in a folder

24   called "Brooke Savannah;" the only thing you were able to see

25   of these files was their titles?

Chappell - Cross / By Ms. Cornelio                    26

1   A    Yes, ma'am.

2   Q    And the titles were simply the names of either Brooke or

3   Savannah with a number?

4   A    That is correct.

5   Q    So you couldn't see the contents?

6   A    That is correct.

7   Q    And you also couldn't see any information regarding

8   whether they had been sent, received, where they came from

9   basically?  Any file paths?

10  A    These files at this time, no ma'am; I cannot determine

11  that.

12  Q    So the files, the images -- you said that you saw two

13  images that had been traded to a undercover in Australia,

14  correct?

15  A    Actually, there were more than that.  I had seen two at

16  the time of the search warrant.  Since then I have seen more.

17  Q    Okay.  And when you say you've seen more, are those more

18  that were shared with the undercover agent in Australia?

19  A    They were part of the image hosting website, as part of

20  the investigation.  Yes, ma'am.

21  Q    Okay.  So I guess -- I'll back up to that and I'll come

22  back to the images themselves.  You said that there's an image

23  hosting website where a user has a profile, correct?

24  A    Correct.

25  Q    Now, how can another user access somebody else's profile,

Chappell - Cross / By Ms. Cornelio                    27

1   and how does that work?

2   A    What they do is users on this account will -- you can view

3   others public profile.  And on that public profile is their

4   user name, a photograph, and then it shows their albums and the

5   album names.  And by browsing these public -- publically

6   viewable profiles, a user can find something they might be

7   interested in.

8           At that point, they can then email or chat message

9   the owner of that account, saying, "Hey I'm interested.  Can I

10  look at your stuff?  Can you grant me access?"  And typically

11  what happens is if their albums are locked, the owner of that

12  album will send the password to the person who wants to view

13  it.

14  Q    And there was one locked folder on the account that you

15  believe was responsible for sharing with an undercover agent?

16  A    Correct.

17  Q    And did -- was the password for that account provided to

18  the undercover agent?

19  A    No, not that I'm -- not that I'm aware of.

20  Q    So the locked files were not accessible to the undercover

21  agent?

22  A    That is my understanding.  Yes, ma'am.

23  Q    And then you said that there was a preview folder

24  available.

25  A    Correct.

1   Q    What does that mean, that a preview folder was available?

2   A    In this particular case, I don't know specifically what

3   was in that folder.  I do know from my experience that the

4   preview is basically -- typically in accounts I've seen they're

5   not necessarily a contraband or child pornographic.  They may

6   be child erotica, but it's the user saying hey, my other stuff

7   has something similar to this, so if you're interested, you

8   know, this is what I might have or something similar to it.

9   Q    So you have no information to support the idea that the

10  preview folder had child pornography images available to the

11  public?

12  A    I do not directly at this time, no ma'am.

13  Q    And then the third folder that you said from the image

14  hosting website that was available was something about a

15  shower?

16  A    X in the shower, yes ma'am.

17  Q    And do you have any information that that folder -- I mean

18  was that folder readily available to --

19  A    Yes, ma'am.

20  Q    -- the public, and do you have any information that that

21  folder contained what meets the federal definition of child

22  pornography?

23  A    No ma'am, it does not contain -- at this point, what I've

24  seen of it does not contain child pornography.

25  Q    Okay.  So when -- okay.  So then moving back to the

Chappell - Cross / By Ms. Cornelio                    29

1    pictures that were actually shared with the undercover agent in

2    Australia --

3    A    Uh-huh.

4    Q    -- there were two of those, correct?

5    A    Yes, ma'am.

6    Q    Okay.  One of them was taken in a bedroom?

7    A    Yes, ma'am.

8    Q    And can you please describe that image?

9    A    The image was a frontal view, again of a prepubescent

10   child that has subsequently been identified as the victim's

11   older daughter -- or I believe it might be the younger

12   daughter, I'm sorry.  It shows the breasts and vaginal area of

13   the child.  The camera angle is facing towards the bed and the

14   window so you see the bed; you can see the window.  There are

15   bed -- there are picture frames on the window.  There's a

16   wicker basket at the foot of the bed and there's a teddy

17   bear -- a teddy bear on top of the bed.

18            All those items were there and seen, and photographed

19   by us and visually compared with the photograph.  It also

20   appears the angle of that photograph was taken from where the

21   TV was placed in the bedroom while we there, and may have --

22   and from the height of it, may have been placed on the TV

23   stand.

24   Q   Is -- how far away is the image from the person who the

25   image is of?

Chappell - Cross / By Ms. Cornelio                    30

1    A    The camera would have been?

2    Q    Yes.

3    A    Maybe two feet.

4    Q    Two feet.  Does -- you said it's a frontal shot; does it

5    include the face?

6    A    Yes.

7    Q    Does it include the feet?

8    A    Well, half -- part of the face.  Yes.

9    Q    Does it include the feet?

10   A    No, ma'am.

11   Q    Does it include the knees?

12   A    I believe it, yes ma'am, just right at the knees.

13   Q    The arms?

14   A    Yes, ma'am.

15   Q    Okay.  You said that you believed it meets -- is the pose

16   suggestive in any way?  I mean --

17   A    Suggestive in --

18   Q    Is anything inherently sexual about the positioning?

19   A    That would be dependent upon the viewer's opinion of what

20   constitutes sexual.  The child appears to be having just

21   undressed or about to get dressed.

22   Q    You said that you believe it meets the federal definition

23   of child pornography.

24   A    Yes ma'am; lewd and lascivious display.

25   Q    Why?

Chappell - Cross / By Ms. Cornelio                          31

1    A     The vaginal area is in full clear view.  It is centered

2    just off center of the picture, but it is one of the first

3    things when you look at the picture.  It's readily available

4    and viewable to the person looking at the picture, and is a

5    clear shot of the vaginal area.

6    Q     But it's not more in focus than the rest of the picture?

7    A     It's centered in the picture so that's one of the first

8    things that a user, I believe, would be drawn to as it's almost

9    the center of the picture.

10             Also, it's very easy to tell that the person depicted

11   in there is a minor child under the age of 18, and is very

12   readily appears to be prepubescent as well.

13   Q     The second image is taken in the bathroom you said?

14   A     Yes, ma'am.

15   Q     And this is -- can you -- I'm sorry.  Can you describe

16   this image?

17   A     This image shows again a prepubescent child; shows the

18   buttocks and vaginal area of the child.  It's turned towards

19   the camera.

20   Q     It shows both the buttocks and the vaginal area?

21   A     The buttocks area, yes ma'am.

22   Q     The buttocks area.

23   A     Yes, ma'am.

24   Q     Not the vaginal area?

25   A     Not the front, no ma'am.  But you can see on the portions

Chappell - Redirect / By Ms. Zack                    32

1   of the leg and stuff.  The angle of the picture is an upward

2   shot, again coming what we believe to be the bottom corner of

3   the bathroom and shooting upwards.  You can see the toilet, the

4   shower, part of the vanity.  There are items on the toilet and

5   the vanity in the picture that were still in the bathroom when

6   we were there during the search warrant.

7   Q    Can you see the other parts of the body except for just

8   the buttocks?  I mean, can you see the back?

9   A    Small part of the back.  You cannot see the head or the

10  arms.

11       **(Pause)**

12       **MS. CORNELIO:**  I have nothing further, your Honor.

13       **THE COURT:**  All right.  Redirect?

14       **MS. ZACK:**  Briefly.

15                **REDIRECT EXAMINATION**

16  **BY MS. ZACK:**

17  Q    Special Agent Chappell, you said that you had at the time

18  of the search had seen the two images that had been traded, but

19  since then you've seen more off of the image hosting site; is

20  that correct?

21  A    Well, off of the information that was provided to us by

22  C3.

23  Q    Okay.

24  A    Yes, ma'am.

25  Q    So, there were more than two images provided by the chat

Chappell - Redirect / By Ms. Zack                    33

1    person using the Troy Traweek name and the explicitcure2008?

2    A    Yes, ma'am.

3    Q    Okay.

4    A    That is correct.

5    Q    And approximately how many images were provided?

6    A    I didn't count them, but there was three, four, five at

7    least, yes ma'am.

8    Q    Okay.  And this is just one chat, correct?  One exchange

9    that we know of at this point?

10   A    At least one that I know of, yes ma'am.

11   Q    Right.  And it seemed that Defense was suggesting that

12   there was no child pornography available -- readily available

13   from Mr. Traweek's profile, but wasn't the profile picture one

14   of the child pornography images?

15   A    It was one of the pictures that I'd actually viewed, yes

16   ma'am.

17   Q    Okay.  And so anyone that publicly went to his profile

18   would see that child pornography image?

19   A    That is correct.

20   Q    So it was out there available to anyone using that image

21   posting website?

22   A    Yes, ma'am.

23   Q    Okay.  It wasn't protected, wasn't hidden, nothing.

24   A    No, ma'am.

25             MS. ZACK:  Okay.  I have nothing further at this

1    time, your Honor.

2              **THE COURT:**  All right.  More cross exam?

3              **MS. CORNELIO:**  Yes, just briefly, your Honor.

4                        **RECROSS EXAMINATION**

5    **BY MS. CORNELIO:**

6    Q    How big is the profile picture?

7    A    Well, that depends on how you display it on your computer.

8    I mean, that's --

9    Q    In this case.

10   A    When I saw it, it's -- I mean, I couldn't give you exact

11   measurements, but it's in the upper left hand corner.  It's

12   visible.  I mean, it's -- I couldn't give you an exact

13   measurement, but it's a -- it's a -- it doesn't take up the

14   whole screen I guess or even half the screen.  It may take up

15   probably less than a quarter of the screen maybe.

16   Q    And you said that this image was of nude children?

17   A    Of the -- a nude child, yes ma'am.

18   Q    A nude child.  Were you able to identify this child?

19   A    It's the girlfriend's daughter.

20   Q    And is it one of the -- I'm just trying to keep track; is

21   it one of the two images that you showed Mr. Traweek's

22   girlfriend -- one of the two images that was also shared with

23   the undercover agent?

24   A    It's one of those images, yes ma'am.

25   Q    And that was his profile image?

Chappell - Recross / By Ms. Cornelio                    35

1  A    Yes, ma'am.

2  Q    Now you actually didn't write the affidavit in support of

3  the complaint in this case, did you?

4  A    No ma'am, I did not.

5  Q    Did you get a chance to review it?

6  A    Yes, ma'am.

7  Q    Isn't it true that nowhere in that report is there any

8  mention of the profile image visibly available to anyone

9  containing child pornography?

10 A    No, ma'am.

11 Q    And then -- I'm just trying to understand.  Ms. Zack said

12 there were more images provided, or that I know that you viewed

13 more images; I'm not fully understanding the context of where

14 these images were provided, or if she said it was in the chat.

15 I'm not really --

16 A    These were images that were provided by Mr. Traweek to the

17 undercover agent by email.

18 Q    By email.

19 A    Yes, ma'am.

20 Q    Subsequent to the chat?

21 A    That's all part of it, yes ma'am.

22 Q    But isn't it true that the chat between Mr. Traweek and

23 the agent, the undercover agent, is provided to the magistrate

24 judge in the complaint in this case?

25 A    At least part of it is, yes ma'am.  I haven't -- I don't

1   know if there's more to it or not, but there is part of the

2   chat there, yes ma'am.

3   Q    And the part of the chat that's there only refers to two

4   images that were provided to the undercover agent?

5            And I don't mean to rush you because I'm --

6   A    I know.  That's fine ma'am.

7   Q    -- take your time.

8            **MS. ZACK:**  Your Honor, we'll stipulate to the

9   contents of the criminal complaint.  It's already part of the

10  proceeding.  I mean it's --

11           **THE COURT:**  All right.  Well, let her ask -- let him

12  answer her question, please.

13           **THE WITNESS:**  Yes, ma'am.  The chat does reference

14  those two images, yes ma'am.

15  **BY MS. CORNELIO:**

16  Q    And it doesn't reference three to five other images that

17  were shared with the agent, correct?

18       **(Pause)**

19  A    Actually, the portion of the chat that is within the

20  criminal complaint and the search warrant affidavit does not

21  reference a actual number of images.  It just talks about

22  images.

23           It does name one; it gives the name of one image

24  called D-L-C snap-00009 P-N-G.  That's one image.  That image

25  match -- actually matches a file name that I found on the thumb

1    drive.

2    Q    And then there's actually a second -- I mean, so on

3    Paragraph 5, it says on line --

4              MS. ZACK:  I'm sorry.  Paragraph 5 of what?

5              MS. CORNELIO:  Of the affidavit supporting the

6    complaint --

7              MS. ZACK:  Thank you.

8    BY MS. CORNELIO:

9    Q    -- in Line 3, it says "during the email chats the suspect

10   sent the UC agent two photos of nude prepubescent females."

11   Why would the complaint omit three to five other images that

12   were provided to the undercover agent?

13             MS. ZACK:  Objection, irrelevant.

14             MS. CORNELIO:  Your Honor --

15             THE COURT:  Overruled.

16             MS. ZACK:  Your Honor, he didn't write it.

17             THE COURT:  Okay.  Overruled.  Cross exam; this is

18   within the scope of cross exam.

19             THE WITNESS:  The -- I don't know why he wouldn't put

20   it on there, or what occurred at that time.  I did not write

21   the affidavit.  I do know that the affidavits typically state

22   that not all information that is known to us at this time is

23   provided in the affidavit for various reasons, but only those

24   -- that information necessary to secure probable cause is

25   provided.

1    **BY MS. CORNELIO:**

2    Q    Okay.

3            **MS. CORNELIO:**  I have no further questions, your

4    Honor.

5            **THE COURT:**  All right.  Recross -- Redirect?  No.

6            Does the Government rest?

7            **MS. ZACK:**  Yes, your Honor.

8            **THE COURT:**  Is the witness excused?  Can the witness

9    be excused?  Yes?

10           **MS. CORNELIO:**  Oh, yes, your Honor.

11           **THE COURT:**  Thank you.

12           **THE WITNESS:**  Thank you, ma'am.

13       **(Witness Excused)**

14           **THE COURT:**  Okay.  So the Government rests.  Do you

15   have any evidence to present for bail or any other issue?

16           **MS. CORNELIO:**  No, your Honor.

17           **THE COURT:**  All right.  So you rest also?

18           **MS. CORNELIO:**  Yes, we do.

19           **THE COURT:**  Okay.  Do you have any argument to

20   present?

21           **MS. CORNELIO:**  May I just have a moment?

22           **THE COURT:**  Sure.

23       **(Pause)**

24           **MS. CORNELIO:**  Your Honor, we would argue that no

25   probable cause exist in this case because it has not been

1    adequately established that any images of actual lewd and

2    lascivious -- any lewd and lascivious images were actually

3    produced and sent over interstate commerce.

4         I would submit that the only images relevant to

5    probable cause in this case today are the two images that we

6    heard testimony about as well as that are specifically

7    identified in the complaint.  And that the fact of nudity and

8    focus on pubic area alone is not sufficient based on the

9    testimony.

10        Alternatively, I would ask that this Court in-camera

11   review those two pictures to make an independent determination

12   regarding whether this Court believes that they adequately

13   constitute lewd and lascivious images that might be child

14   pornography since we were only really able to hear a

15   description.  But I would submit based on the descriptions

16   that's insufficient under the test to establish that it was

17   child pornography.

18        **THE COURT:**  Have you seen the images?

19        **MS. CORNELIO:**  I have not yet seen the images, your

20   Honor.

21        **THE COURT:**  Have you seen the images?

22        **MS. ZACK:**  Yes, your Honor.

23        **THE COURT:**  Okay.  I don't mind looking at them if

24   they're in the courtroom but, you know, show them to everybody

25   please.

1          **MS. ZACK:**  I can get them, your Honor.

2       **(Pause)**

3          Your Honor, the only copies I have has -- the portion

4  is blacked out, but you can see the focus of it.  So they're --

5  I can show them to Defense counsel.

6          **THE COURT:**  You don't have the actual images that

7  were sent?

8          **MS. ZACK:**  I have images, but the part that's --

9          **THE COURT:**  They're sanitized.

10         **MS. ZACK:**  They're sanitized; correct.  They're just

11 black

12         **THE COURT:**  All right.

13         **MS. ZACK:**  -- I mean, you can -

14         **THE COURT:**  Go ahead and show them to your opposing

15 counsel first.

16      **(Pause)**

17         **THE COURT:**  Let me see.

18         **MS. ZACK:**  Yeah, that one you have to turn sideways;

19 correct.  You have it the right way; the bedroom one.

20         **THE COURT:**  What does that show?

21         **MS. ZACK:**  This one, the bedroom one, your Honor,

22 this is the child's arm and back and hair, and this would be

23 her buttocks and this is in -- this is her thighs.

24         **THE COURT:**  Okay.

25         **MS. ZACK:**  It's just very close up to where he camera

41

1  was.

2            **THE COURT:**  And it's been blacked out.

3            **MS. ZACK:**  Correct.  The buttocks have been blacked

4  out and in this one it's obvious that her genital area and her

5  breasts have been covered with a black band --

6            **THE COURT:**  Okay.

7            **MS. ZACK:**  -- for sanitization purposes.

8            **MS. SPEAKER:**  Here's the one that's not blacked out.

9            **MS. ZACK:**  Oh, we have the -- we have copies of them

10  not blacked out, your Honor, actually.

11            **THE COURT:**  Did you show them to your opposing

12  counsel?

13            **MS. ZACK:**  I did.

14            **MS. CORNELIO:**  I saw them, your Honor.

15            **MS. ZACK:**  Yes, they were shown.

16            **THE COURT:**  All right.  So you better give us exhibit

17  numbers.

18            **MS. ZACK:**  Yes.

19            **THE COURT:**  You have -- those first two are 1 and 2.

20            **MS. ZACK:**  And then do you want to make the

21  corresponding unsanitized ones 1A and 2A?

22            **THE COURT:**  Yeah, but they're not --

23            **MS. ZACK:**  I'll write on the back of them.

24            **THE COURT:**  -- actually identical.

25            **MS. ZACK:**  Well, no because these have been cropped

```
 1   and sanitized, but I can --

 2          THE COURT:  But this is a different pose?

 3          MS. ZACK:  Yeah and those were different.  They're --

 4   yeah; they're multiples so.

 5          MS. SPEAKER:  They may not be the same, Sherri.

 6          MS. ZACK:  They might not be --

 7          MS. SPEAKER:  The same as the blacked out ones.

 8          MS. ZACK:  Okay.  Identical but they're --

 9          THE COURT:  Okay.

10          MS. ZACK:  -- from the -- I mean, it's obvious

11   they're from the same location.

12          THE COURT:  Right.

13          MS. ZACK:  I'll mark them and give them to Beverly.

14       (Government Exhibits Numbers 1, 1A, 2, and 2A were marked

15   for identification)

16          THE COURT:  Okay.  Go on please with your argument.

17          MS. CORNELIO:  Your Honor, from looking at the

18   redacted images, one of the images is so dark that I would

19   submit it doesn't meet those standards, and then the other one

20   I have a test -- I can provide a site with the test outlining

21   it.  It's 248 F.3d 394.  It's a Fifth Circuit case and it's --

22   the questions are whether the image's focal point is a child's

23   genitalia or pubic area.  I would submit that in the full non-

24   dark image, there is not a specific focal point.  It's just a

25   nude image.
```

1              The second is, is the setting depicted in the image

2    sexually suggestive?  I don't think that that factor applies in

3    this case.

4              The third is, is the child depicted in an age

5    inappropriate pose or attire?  I don't think that that's

6    present in this case.

7              Again, I can just provide the Court with these

8    factors if it prefers, but I don't think that -- I think it's

9    just a nudity shot, your Honor.  It's not specifically

10   pornography, or lewd and lascivious, and nudity has

11   specifically been held to not be child pornography.

12             So, with that argument I would submit not -- probable

13   cause has not been established for the two images that were

14   transmitted over interstate commerce.

15             **THE COURT:**  Okay.  Anything else?

16             **MS. CORNELIO:**  No, your Honor.

17             **THE COURT:**  About bail or --

18             **MS. CORNELIO:**  No, your Honor.  We will just rest on

19   the --

20             **THE COURT:**  All right.  Do you have a response?

21             **MS. ZACK:**  Absolutely, your Honor.  The factors that

22   counsel suggest are all well and good, but first let's start

23   with all your Honor has to find is probable cause.  That

24   there's this -- whether something is or is not child

25   pornography is a finding of fact for a jury.

44

```
1              But let's discuss the factors that Defense counsel

2    suggests.  She wants your Honor to view these images in a

3    vacuum, and that's not what the case law suggests.  They were

4    included as part of a chat discussing wanting to have sex with

5    these children.  They were discussed and traded as part of two

6    people communicating who believed they had a shared interest in

7    the sexual exploitation of children.

8              And let's talk about the pictures themselves.

9    Defense counsel suggests these are just innocent pictures;

10   innocent, nudity pictures.

11             What innocent, nudity pictures of children are taken

12   with cameras placed surreptitiously within rooms in order to

13   capture these children naked.

14             The bathroom shot specifically was taken from an

15   angle from down low up high, so the view is looking from the

16   ground up and the first thing you would see are genitals and

17   then the breasts.  And there is no legitimate purpose for a

18   camera to be hidden in a bathroom.  I mean, we can start with

19   that.

20             So, you know she can whitewash it all she wants that

21   well, if you just look at the image, and the image only, and

22   the context of these factors, but that's not what the case law

23   says.  You have to look at the entire context.  There is a

24   picture, there's a video of the Defendant placing this camera

25   in there.  And while that is not part of the description, if
```

1    you look at the photo, it's very obvious that this wasn't a

2    child walking by and someone snapped a picture.  And oh, you

3    know, this isn't a cute baby in a tub covered with bubbles and

4    rubber duckies.  This is a child who has no idea that this

5    picture is being taken of her.

6            The profile that's part of the image hosting website

7    has one of these images displayed as his image profile.  There

8    is a search on his girlfriend's phone for how to get a

9    9 year-old to perform oral sex on you; how to trick a

10   9 year-old into doing that.

11           The view of child pornography is from the person

12   viewing it, and the person taking it, and their interest, their

13   sexual interest in it.  So, you can suggest all you want that

14   these are not child pornography, but they're nothing other than

15   child pornography.  And it's very obvious if you put them in

16   context with the chat that that is what they are, and that the

17   officer certainly in the affidavit established that there was

18   probable cause for the magistrate to find in order to arrest

19   the Defendant.  And we don't believe that anything presented

20   would disturb or should disturb that finding.

21           Additionally, your Honor, all of the information

22   leads back particularly to this Defendant.  And as to the issue

23   of bond and detention, I know the Court's aware that this is a

24   presumption in this case, and I think that we have demonstrated

25   that the Defendant is absolutely a danger, and your Honor can

1    factor in more than what you would look at for probable cause

2    in making that determination.  There's --

3              **THE COURT:**  Okay.  Could you please be more specific

4    about the presumption?

5              **MS. ZACK:**  Absolutely, your Honor.  Under Title 18,

6    Section 3142(e)(3)(E), there is a presumption that the

7    Defendant is a danger to the community and a flight risk based

8    on the nature of the crime in this case.

9              **THE COURT:**  Because it's distribution?

10             **MS. ZACK:**  Because it's production --

11             **THE COURT:**  Okay.

12             **MS. ZACK:**  -- and distribution of child pornography.

13             **MS. CORNELIO:**  Your Honor, I would just object to the

14   complaint, specifically charges with production only, not

15   distribution.

16             **THE COURT:**  Okay.

17             **MS. ZACK:**  Okay, well if Defense counsel wants to go

18   there, production carries a much higher minimum mandatory, and

19   that also would be why the Defendant would be a flight risk.

20   He's facing a minimum 15 years in federal prison.  He has no

21   job.  He has no assets.  He has no reason to stay and answer to

22   these charges.

23             He is violent.  He has been convicted of multiple

24   violent crimes as is evidenced in the Pretrial Services Report.

25   His own family is not willing to be a surety for him.

1          Two months -- within a two month period of these

2    children living in the home, their pictures have now been

3    splashed over the Internet by the Defendant.  Those can never

4    be brought back.  He's chatting about wanting to have sex with

5    them.  He is Googling how to trick a 9 year-old into performing

6    oral sex on him on his girlfriend's phone.

7          He's gone to extensive lengths to hide his child

8    pornography collection or what we believe is a child

9    pornography collection based on the file names.  The daughters'

10   names -- the girlfriend's daughters' names show up in encrypted

11   files.  There's no legitimate reason for him to have their

12   names in encrypted files.  It's not family fun photos.  All of

13   those were unencrypted on the computer that they shared, that

14   the girlfriend would have access to; that anyone could access

15   too.

16          I don't believe that there's any conditions that

17   could assure his appearance.  He attempted to kill himself, so

18   he's a danger to himself.

19          **THE COURT:**  Where did that happen?

20          **MS. ZACK:**  The night he was arrested.

21          **THE COURT:**  Where?

22          **MS. ZACK:**  At the FDC.

23          **THE COURT:**  All right.

24          **MS. ZACK:**  It postponed his initial appearance by a

25   day and a half.  And there doesn't appear anything has been --

48

1    not only has there been nothing presented to overcome the

2    presumption, I think everything that's been presented further

3    demonstrates that there is no guarantee that, A, he will appear

4    and, B, that he isn't a danger to the community, specifically

5    children and/or potentially himself.

6         And we would ask your Honor that not only you find

7    that there's probable cause, but that he be detained pending

8    indictment in this matter.

9         **THE COURT:**  Okay.  Now, I need to see the exhibit

10   numbers --

11        **MS. ZACK:**  Yes, so --

12        **THE COURT:**  -- that you put on the exhibits.

13        **MS. ZACK:**  -- I have Exhibits 1 and 2 are the

14   sanitized photos.  Exhibit Number 1 being the one with the

15   bedroom, with the buttocks.

16        Exhibit Number 2 would be the bathroom of the full

17   frontal nudity, but it's blocked out, so those are the two.

18        And then Exhibit 3 is again the bedroom shot with the

19   buttocks exposed; the unsanitized.

20        And Exhibit 4 is a bathroom shot that is not

21   sanitized.

22        And we'd ask, your Honor, that those exhibits be

23   sealed.

24        **THE COURT:**  Well, not only are they going to be

25   sealed, but they're also going to be -- you're going to have to

**EXCEPTIONAL REPORTING SERVICES, INC**

1    take them and keep them in custody in case of any further need

2    for them.

3              **MS. ZACK:**  Absolutely, your Honor.

4              **THE COURT:**  I'm not going to maintain the exhibits.

5              Do you have any other comments?

6              **MS. CORNELIO:**  Your Honor, my only response would be

7    that -- and I could provide the Court with my copy of the case,

8    much of what was presented --

9              **THE COURT:**  I'll take your copy of the case.

10             **MS. CORNELIO:**  And then the question --

11             **THE COURT:**  Oh, let me just look at it.

12             **MS. CORNELIO:**  Of course.  The question regarding

13   what is -- constitutes child pornography?  Some of the personal

14   factors that were alluded to by the Government are not relevant

15   to that question, and that is a preliminary question that is

16   important for finding probable cause in the production of child

17   pornography.

18             **THE COURT:**  Okay.  All right.  Anything else from

19   either side?

20             **MS. ZACK:**  No.

21             **THE COURT:**  No?  Okay.  Thank you.  So, the six

22   factor test in this *US versus Fox*; is that the name of the

23   case?

24             **MS. CORNELIO:**  Yes, your Honor.

25             **THE COURT:**  Okay.  And at Page 10, at the Lexus

1    version.  The six factor test which was developed in *US versus*

2    *Dost* asks that is the image focal point the child's genitalia

3    or pubic area?  Is the image -- is the setting sexually

4    suggestive?  Is the pose inappropriate or attire inappropriate?

5    Is the child partially clothed or nude?  Does the image suggest

6    sexual coyness or willingness to engage in sexual activity?  Is

7    the image intended to elicit a sexual response in the viewer?

8            And I think there's probable cause that Image

9    Number 4 does -- does pass the test, does constitute child

10   pornography.  There's probable cause in my opinion that at

11   least Image Number 4 does pass the test, and I'm making a

12   positive finding of probable cause; that there is adequate

13   evidence in the complaint, the affidavit attached to the

14   complaint, the testimony presented at the hearing today

15   including the Exhibit Number 4, at least, that Mr. Traweek,

16   this Defendant, committed the offense described in the

17   complaint.  So I do find that there is probable cause.

18           Secondly, I don't find that there are any conditions

19   of -- bail conditions that I can fashion that would assure the

20   safety of people in the community or even the Defendant himself

21   and that would assure his appearance at all his court

22   proceedings, so Mr. Traweek, I'm ordering that you must be

23   detained pending your trial in this case.

24           And you'll be in the Federal Detention Center, and

25   you will still have the right to counsel privately with your

1   lawyer while you await your trial or other resolution of this

2   matter.

3          And in the near future, you will be brought back to

4   court if an indictment's returned against you.  And at that

5   hearing you'll be asked to enter a not guilty plea to the

6   charges against you.  At that time you would receive a specific

7   judge and a specific date for your trial in this case.  And

8   that'll happen in the near future.

9          All right.  So that's my -- that's my decision, and

10  I'll make the detention order in writing today.  And I'll, you

11  know, explain all the reasons why I made a detention order

12  including I am relying on the presumption of flight and danger

13  to the community that was referenced by the Government in 18

14  United States Code, Section 3142 (e)(3)(E) which arises because

15  the probable cause finding that child pornography was produced

16  by Mr. Traweek.

17         Okay.  And also the fact that there's a 15 year

18  mandatory minimum prison term if he's found guilty in this case

19  and has this -- the risk of flight.  And my decision is also

20  based on his criminal history, and I'll make it more, you know,

21  formal in the written order.

22         And please withdraw your four exhibits.

23         **MS. ZACK:**  Yes, your Honor.

24         **THE COURT:**  And please withdraw your case law.  Thank

25  you.

1              All right.  The hearing is adjourned.

2         (This proceeding was adjourned at 11:25:16 a.m.)

3

4

                        CERTIFICATION


I certify that the foregoing is a correct transcript from the

electronic sound recording of the proceedings in the above-

entitled matter.




_____              ___May 28, 2014___

                        TONI HUDSON, TRANSCRIBER